OPINION OF THE COURT
Andrea Masley, J.
Plaintiff Stephen Matrangolo, D.C., P.C., a chiropractic practice, commenced this action in June 2007 for the recovery of no-fault benefits for services rendered to assignors Tina Espinozo-Hernandez and Edgar Hernandez for injuries arising from a car accident in December of 2006. The answer dated August 17, 2007 consists of six affirmative defenses including: (2) plaintiff lacks standing; (4) services provided by an independent contractor; and (6) the referral was an improper self-referral. After trial on June 9, 2011, the court reserved decision and the parties were directed to submit posttrial memoranda on issues raised but not resolved at trial.*
*536 For the following reasons, the court finds that Public Health Law § 238-a does not apply to the electromuscular testing provided here and thus is not a bar to Dr. Matrangolo’s claim. However, based on the testimony and evidence before it, the court finds that Dr. Matrangolo is not entitled to compensation for services provided by Dr. Brawner.
The parties stipulated at trial to all 11 outstanding health insurance claim forms for electromuscular testing services rendered in the amount of $2,168.82 for Ms. EspinozoHernandez and $2,807.64 for Mr. Hernandez. All services for assignor Tina Espinozo-Hernandez were rendered on December 11, 18, and 27 of 2006. For assignor Edgar Hernandez, services were rendered on December 18 and 27 of 2006, and on January 3 and 8 of 2007. Maria Ingrassia, Dr. Matrangolo’s medical biller, the sole witness, testified for plaintiff that Baldwin Medical referred the assignors to Dr. Matrangolo for neuromuscular testing, and that bills for plaintiffs services were timely submitted and remain unpaid. Defendant stipulated to plaintiffs prima facie case and asserted, as affirmative defenses, that the referral to Dr. Matrangolo constitutes a violation of Public Health Law § 238-a and that plaintiff lacks standing since it is billing for services provided by a nonparty physician. Plaintiff argued that defendant has failed to rebut its prima facie case and that Public Health Law § 238-a applies to physicians but not to chiropractors such as himself.
Defendant sought to introduce a lease between plaintiff and Baldwin Medical over objection from plaintiff. Defendant sought sanctions for plaintiff’s noncompliance with its May 13, 2011 subpoena ad testificandum and duces tecum of Dr. Matrangolo which seeks the patient file for each AAO; the leases between Dr. Matrangolo and the referring provider for 2006, 2007 and 2008; records of payments made by Dr. Matrangolo to the referring provider; all correspondence between Dr. Matrangolo and the referring provider; all W-2s or 1099s issued by Dr. Matrangolo to the technician who administered the tests in 2006, 2007 and 2008; and all documents regarding the financial relationship between plaintiff and the referring provider.
On cross-examination, Ms. Ingrassia identified Dr. Matrangolo’s signature on the lease and defendant offered it into evidence as an admission against interest. Had plaintiff responded *537 to defendant’s trial subpoena, defendant could have offered the lease as a business record. However, by refusing to comply and not moving for relief from the subpoena, plaintiff robbed defendant of the opportunity to establish the requisite foundation. (CPLR 4518.) The lease had been identified by plaintiff in response to interrogatories which had been court ordered. Alternatively, defendant asked the court to make an adverse inference against plaintiff based on plaintiffs failure to respond to the trial subpoena and allow the lease into evidence.
The witness also identified Dr. Brawner as a doctor who is associated with Baldwin Medical but who is not an employee of Dr. Matrangolo.
Defendant read plaintiffs responses to interrogatories, as to the electromuscular testing of the AAOs, into the record. As to who administered the test to the AAOs, plaintiff responded Dr. Josephine Brawner. In response to the question how many people do the testing for Dr. Matrangolo, plaintiff responded Dr. Brawner. At trial, plaintiff objected to the interrogatories as evidence because plaintiffs counsel explained that Dr. Matrangolo made a mistake when he responded to the interrogatories; an employee not Dr. Brawner administered the tests here. The court struck plaintiffs counsel’s testimony. The court rejects all of plaintiffs attempts to change plaintiffs discovery responses in its posttrial brief. Plaintiff did not supplement its discovery or issue a correction. The time for testimony and evidence was at trial.
Exhibit A in evidence is a lease between Baldwin Medical Services PC. and Dr. Stephen Matrangolo Corporation from January 1, 2007 to December 31, 2008. This lease was introduced at trial by defendant over plaintiffs objection. Plaintiff produced this lease in discovery. Indeed, plaintiff annexed the lease to plaintiffs posttrial memorandum as evidence of its compliance with discovery. Accordingly, there is no reason to believe the lease is not trustworthy. Plaintiffs objection to admission of the lease is curious since the existence of a valid lease in effect from January 1, 2007 establishes a safe harbor for plaintiff for those services rendered in 2007. However, having failed to produce in discovery or at trial a lease for 2006, plaintiff would not be entitled to the protection of Public Health Law § 238-a (5) (b) (i). Therefore, if Public Health Law § 238-a applied to plaintiff, then he would be entitled to reimbursement only for those services rendered after January 1, 2007. Accordingly, it is unnecessary to otherwise address the subpoena issues.
*538 In its posttrial memorandum, defendant argues that Dr. Matrangolo rents space from the referring provider Dr. Brawner for purposes of rendering services for which he is referred, and that this relationship in and of itself constitutes an improper referral under Public Health Law § 238-a. The absence of a lease for the 2006 calendar year, according to defendant, constitutes evidence of an improper referral. Lastly, defendant argues that plaintiff lacks standing since he billed for services rendered by Dr. Brawner, a nonparty physician.
Public Health Law § 238-a prohibits a practitioner from making a referral for services to a provider when the practitioner or an immediate family member of such practitioner has a “financial relationship” with the provider. (Stephen Matrangalo, DC, P.C. v Allstate Ins. Co., 31 Misc 3d 129[A], 2011 NY Slip Op 50517[U] [App Term, 1st Dept 2011].) A financial relationship is defined in Public Health Law § 238 (3) as “an ownership interest, investment interest or compensation arrangement.” A compensation arrangement is defined as “any remuneration between a practitioner . . . and a health care provider.” (Public Health Law § 238-a [5] [a].) The statute is clear that compensation does not include payments for the rental or lease of office space if there is a written agreement signed by the parties, for a rental term of at least one year, consistent with fair market value in an amount that does not vary with “volume or value of any referrals of business between the parties.” (Public Health Law § 238-a [5] [b] [i] [A].)
A plain reading of the statute supports plaintiff’s interpretation that, as a chiropractor, his services fall outside the ambit of Public Health Law § 238-a. Public Health Law § 238-a provides:
“1. (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.
“(b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or *539 imaging services furnished pursuant to a referral prohibited by this subdivision.
“2. Subdivision one of this section shall not apply in any of the following cases:
“(a) practitioners’ services — in the case of practitioners’ services provided personally by, or under the supervision of, another practitioner in the same group practice as the referring practitioner;
“(b) in-office ancillary services — in the case of health or health related items or services (i) that are furnished personally by the referring practitioner, personally by a practitioner who is a member of the same group practice as the referring practitioner, or personally by individuals who are employed by such practitioner or group practice and who are supervised by the practitioner or by another practitioner in the group practice; and in a building in which the referring practitioner, or another practitioner who is a member of the same group practice, furnishes practitioners’ services unrelated to the furnishing of such items or services, or in the case of a referring practitioner who is a member of a group practice, in another building which is used by the group practice for the centralized provision of such items or services of the group; and (ii) that are billed by the practitioner performing or supervising the services, by a group practice of which such practitioner is a member, or by an entity that is wholly owned by such practitioner or such group practice.” (Emphasis added.)
Public Health Law § 238 (11) defines “Practitioner” as “a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist.” (Emphasis added.)
Public Health Law § 238 defines each of the five enumerated “services”:
“1. ‘Clinical laboratory services’ shall mean the microbiological, serological, chemical, hematological, biophysical, cytological or pathological examination of materials derived from the human body, for the purposes of obtaining information for the diagnosis, prevention, or treatment of disease or the assessment of health condition . . .
*540 “13. ‘X-ray or imaging services’ shall mean diagnostic imaging techniques which shall include but not be limited to the following:
“(a) Conventional x-ray or radiology.
“(b) Fluoroscopy.
“(c) Digital radiography.
“(d) Computed tomography.
“(e) Magnetic resonance imaging.
“(f) Nuclear imaging.
“(g) Ultrasonography.
“(h) Angiography.
“14. ‘Pharmacy services’ shall mean the preparing, compounding, preserving or, the dispensing of drugs, medicines and therapeutic devices on the basis of prescriptions or other legal authority.
“15. ‘Radiation therapy services’ shall mean the use of high energy x-rays, particles, or radiation materials for the treatment of cancer and other diseases.
“16. ‘Physical therapy services’ means physical therapy as defined by section sixty-seven hundred thirty-one of the education law.”
According to Education Law § 6731, “Physical therapy” is defined as
“a. The evaluation, treatment or prevention of disability, injury, disease, or other condition of health using physical, chemical, and mechanical means including, but not limited to heat, cold, light, air, water, sound, electricity, massage, mobilization, and therapeutic exercise with or without assistive devices, and the performance and interpretation of tests and measurements to assess pathophysiological, pathomechanical, and developmental deficits of human systems to determine treatment, and assist in diagnosis and prognosis.
“b. The use of roentgen rays or radium, or the use of electricity for surgical purposes such as cauterization shall not be included in the practice of physical therapy.” (Emphasis added.)
The service at issue here is “electromuscular testing,” which is not an enumerated service in Public Health Law § 238-a. Education Law § 6551 defines the practice of “chiropractic” as:
“1. The practice of the profession of chiropractic is defined as detecting and correcting by manual or mechanical means structural imbalance, distortion, *541 or subluxations in the human body for the purpose of removing nerve interference and the effects thereof, where such interference is the result of or related to distortion, misalignment or subluxation of or in the vertebral column.
“2. a. A license to practice as a chiropractor shall not permit the holder thereof to use radio-therapy, fluoroscopy, or any form of ionizing radiation except X-ray which shall be used for the detection of structural imbalance, distortion, or subluxations in the human body.
“b. The requirements and limitations with respect to the use of X-ray by chiropractors shall be enforced by the state commissioner of health and he is authorized to promulgate rules and regulations after conferring with the board to carry out the purposes of this subdivision.
“c. Chiropractors shall retain for a period of three years all X-ray films taken in the course of their practice, together with the records pertaining thereto, and shall make such films and records available to the state commissioner of health or his representative on demand.
“3. A license to practice chiropractic shall not permit the holder thereof to treat for any infectious diseases such as pneumonia, any communicable diseases listed in the sanitary code of the state of New York, any of the cardio-vascular-renal or cardio-pulmonary diseases, any surgical condition of the abdomen such as acute appendicitis, or diabetes, or any benign or malignant neoplasms; to operate; to reduce fractures or dislocations; to prescribe, administer, dispense or use in his practice drugs or medicines; or to use diagnostic or therapeutic methods involving chemical or biological means except diagnostic services performed by clinical laboratories which services shall be approved by the board as appropriate to the practice of chiropractic; or to utilize electrical devices except those devices approved by the board as being appropriate to the practice of chiropractic. Nothing herein shall be construed to prohibit a licensed chiropractor who has successfully completed a registered doctoral program in chiropractic, which contains courses of study in nutrition satisfactory to the department, from using nutritional counseling, *542 including the dispensing of food concentrates, food extracts, vitamins, minerals, and other nutritional supplements approved by the board as being appropriate to, and as a part of, his or her practice of chiropractic. Nothing herein shall be construed to prohibit an individual who is not subject to regulation in this state as a licensed chiropractor from engaging in nutritional counseling.” (Emphasis added.)
Not one of the enumerated “services” includes neuromuscular electrical testing or chiropractic services. The statute clearly bars Dr. Matrangolo as a “practitioner” from making a referral to a family member or entity in which he has a financial interest, but it does not bar a practitioner, such as Dr. Brawner, from referring a patient to Dr. Matrangolo for chiropractic services or testing that falls within the scope of chiropracty because chiropracty is not one of the five enumerated services in Public Health Law § 238-a.
“Public Health Law § 238-a has an obvious and salutary purpose: to prevent the provision of health care from being based on financial incentive rather than patient welfare and medical necessity.” (Matrangolo, as Assignee of David Fitzhugh v Progressive Cas. Ins. Co., Civ Ct, NY County, Dec. 1, 2010, index No. 52599/09.) It is clear from the legislative history that the legislature was concerned about physician investors making self-referrals to clinical laboratories, imaging services and physical therapy. (Mem of Assemblyman Richard N. Gottfried, 1992 NY Legis Ann, at 513; Governor’s Mem approving L 1992, ch 803, 1992 NY Legis Ann, at 515.) Pharmacies were added in 1993. (Governor’s Program Bill Mem approving L 1993, ch 443, 1993 NY Legis Ann, at 321.) Whether to include “chiropracty” or “electromuscular” testing as an enumerated service in Public Health Law § 238-a is a decision to be made by the legislature. Although the Public Health Law is not a bar to plaintiffs claims, Dr. Matrangolo is not entitled to payment because the evidence before the court is that Dr. Brawner, not Dr. Matrangolo, provided the services. (A.B. Med. Servs. PLLC v Liberty Mut. Ins. Co., 9 Misc 3d 36 [App Term, 2d Dept 2005].) In the claim forms in evidence, plaintiff states that the tests were administered by Dr. Brawner.
Accordingly, it is ordered, that the case is dismissed with prejudice.

 The purpose of the posttrial memoranda was to provide the parties an opportunity to explain the legal basis for arguments made during trial; not for the submission of additional testimony or evidence. Accordingly, the court rejects Dr. Matrangolo’s affidavit. The time for his testimony was at trial in response to defendant’s subpoena. Likewise, the court rejects defendant’s submission of examinations before trial of Dr. Matrangolo taken in other cases (e.g. June 5, 2008 transcript, without an index number, states that it was *536 taken by order of Justice Lebedeff in Queens County Civil Court where the as assignee of [AAO] is Ashak Akram; and March 12, 2007, in 116 different matters for which the index numbers are not listed).